## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHARON M. SELBY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Civil Action No.: 5:13-CV-02315-RDP** |
| | } | |
| **CAROLYN W. COLVIN,** | } | |
| **Acting Commissioner of Social Security,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OF DECISION

Plaintiff Sharon Selby brings this action pursuant to Title II of Section 205(g) of the Social Security Act (the "Act"), seeking review of the decision of the Administrative Law Judge ("ALJ"), denying her claims for disability and disability insurance benefits ("DIB"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be affirmed.

**I.    Proceedings Below**

This action arises from Plaintiff's application for disability and disability insurance benefits under Title II, filed on June 18, 2011. (R. 116). The application alleged disability beginning on September 15, 2009. (*Id*.). Plaintiff's claims were denied on October 21, 2011. (R. 64-68). Plaintiff subsequently requested a hearing on November 17, 2011. (R. 72). Plaintiff's request was granted and a hearing was held on October 3, 2012, via videoconference in Florence, Alabama. (R. 12, 32-61). Plaintiff appeared in Huntsville, Alabama with her non-attorney representative. (R. 12, 34). Also present at the hearing was a Vocational Expert. (*Id*.).

On November 9, 2012, the ALJ issued a decision, finding Plaintiff had not been under a disability as defined by the Act since her alleged onset date of September 15, 2009. (R. 26-27). After the ALJ rendered his decision, Plaintiff requested review by the Appeals Council on November 30, 2012. (R. 8).  The Appeals Council denied Plaintiff's request on October 23, 2013, thereby making the ALJ's decision the final decision of the Commissioner and, therefore, a proper subject of this court's appellate review. (R. 1-4).

At the time of the hearing, Plaintiff was fifty-five years old. (R. 12, 37, 116).  She completed high school and also took classes at a junior college.  (R. 37).  Plaintiff previously worked as a daycare operator, sewing machine operator, and floral designer. (R. 38, 52, 154). Plaintiff alleges she is unable to work due to fibromyalgia and Raynaud's disease. (R. 37).

Plaintiff's function report, filled out by her husband Stanley Selby, states that Plaintiff's condition causes her problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, memory, completing tasks, concentration, understanding, following instructions, and using her hands. (R. 168, 181).  However, she can follow both written and spoken instructions "well." (*Id*.).  Plaintiff's function report further states that she does not use crutches, a walker, wheelchair, cane, brace/splint, artificial limb, hearing aid, or artificial voice box. (R. 169).  The only instruments she uses are glasses/contact lenses which were prescribed to her. (*Id*.).  She states that her illnesses do not inhibit her personal care, but do prevent her from "keep[ing] a job" or doing "all housework." (R. 164).  She cooks "sometimes" but "fatigue [and] pain" cause her to "not cook as often" and she can do some housework but "it takes longer now [and her] mother comes and helps with most housework." (R. 165).  She goes outside "most every day," goes shopping for groceries once every two weeks, and although she is able to pay bills, her "husband does most of this." (R. 166).

Along with Plaintiff's own Function Report, Plaintiff's husband also submitted on her behalf an Adult Third Party Functional Report. (R. 181-88).  Mr. Selby reported that Plaintiff watches television, does some light housekeeping, and must rest often. (R. 181).  He further reported that Plaintiff paints as a hobby. (R. 185).  Additionally, he noted that Plaintiff cannot work full time or do "all" house cleaning and that her condition affects her sleep. (R. 182).  Contrary to Plaintiff's Function Report, Mr. Selby noted Plaintiff goes grocery shopping "about once a week," and socially spends time with others on a daily basis. (R. 167, 184-85).

On June 22, 2009, Plaintiff visited Rheumatology Associates of North Alabama, P.C. and underwent a review which indicated she was positive for morning stiffness "which is actually associated with gel phenomenon," but had no swelling in the joint. (R. 337).  During physical examination, it was observed that Plaintiff had trigger points located mainly at her usual spots, no active synovitis or progressive deformity, her range of motion was well preserved with no nodules noted, and her reflexed, motor and sensory were intact. (R. 320-38).  Plaintiff was diagnosed with fibromyalgia and advised to follow up in six months or sooner if needed. (R. 338).

Plaintiff has visited her primary care physician, Dr. Hood, on numerous occasions. (R. 248-68, 304-18, 340-54).  In September 2010, Plaintiff visited Dr. Hood to "follow up on fibromyalgia pain." (R. 249).  Dr. Hood noted that Plaintiff's symptoms of pain improved with medication. (*Id.*).  In October 2010, Plaintiff visited Dr. Hood twice due to cold symptoms, both times denying muscle weakness, joint pain, or back pain. (R. 251-54).  In November 2010, Plaintiff again presented with cold symptoms and was "positive for back pain." (R. 255-56).  In December 2010, Plaintiff was seen for a follow up for hypertension but denied muscle weakness, joint pain, or back pain. (R. 257-58).  In March 2011, on two separate occasions, Plaintiff was

seen first for a follow up of chronic back pain, and second for a follow up from a cold. (R. 259-63).  On the second visit, Plaintiff denied muscle weakness, joint pain, or back pain. (R. 262).  In April 2011, Plaintiff visited Dr. Hood for fibromyalgia complaining of "pain all over." (R. 264).  Dr. Hood noted Plaintiff's scale of ten pain level without medication was a nine and with medication was a three. (*Id*.).

Plaintiff next visited Dr. Hood in October 2011 for a yeast infection, refill of sleep aid, and a steroid shot for fibromyalgia. (R. 318).  On January 3, 2012, Plaintiff was seen for a follow up on fibromyalgia, refills for "all meds," and a runny nose, congestion, fever, and diarrhea.  (R. 317).  On this same date, Dr. Hood prescribed a walker for Plaintiff. (R. 312). This was in addition to prescriptions issued on the same date for Premarin, Soma, Cimetidine, Ambien, Lyrica, Lisinopril, Naproxen, and Tramadol. (R. 313, 316-16).  Plaintiff was seen by Dr. Hood between February 2, 2012 and May 3, 2012 primarily for cough, congestion, and cold related symptoms. (R. 19, 307-14).

On June 7, 2012, Plaintiff visited Dr. Hood again, this time for problems with her right shoulder after she had been lifting and pulling boxes. (R. 308).  She underwent a review of her symptoms where it was noted that she had nausea and diarrhea three days prior, but no chest or abdominal pain. (*Id*.).  Dr. Hood diagnosed Plaintiff with sinusitis and tendonitis of the right shoulder. (*Id*.).

Plaintiff's next visit with Dr. Hood was on August 23, 2012.  (R. 307-14).  She and Dr. Hood discussed changing her medication and "her renewal for her disability."  (*Id*.).  Dr. Hood completed a Medical Source Statement where he stated that he was treating Plaintiff for Raynaud's Disease of the hands and feet, fibromyalgia, depression, and insomnia. (R. 19, 306).  Dr. Hood opined that due to these conditions, Plaintiff was unable to work.  (*Id*.).  That same

day, Dr. Hood wrote a letter in which he stated that he was currently treating Plaintiff for Raynaud's Disease, fibromyalgia, depression, and insomnia, and he believed that these conditions rendered Plaintiff "unable to work." (R. 306).

Dr. Hood completed a "Medical Opinion Re: Ability to do Work-Related Activities (Physical)" on December 6, 2012. (R. 341-43).  In this report, Dr. Hood noted that Plaintiff is "unable to tolerate extreme heat or cold due to Raynaud's" and should also avoid all exposure to wetness, noise, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights. (R. 343).  During this time, Plaintiff had laboratory studies done that revealed a positive ANA and therefore she was referred to a rheumatologist. (R. 19, 304-18, 340-54).  Medical professionals at Rheumatology Associates of North Alabama, P.C. saw Plaintiff on April 25, 2012 and found that, while she had a positive ANA test, her profile was negative. (R. 19, 320). Rheumatology Associates additionally noted that Plaintiff had longstanding Reynaud's, but it had not been exacerbated recently. (*Id*.).

Amidst her numerous visits to Dr. Hood, Plaintiff also was examined by other doctors.  In August 2011, Plaintiff was examined by Dr. Reddy who found Plaintiff's range of motion for her cervical spine, dorsolumbar spine, shoulder, elbow, forearm, hip, knee, ankle, wrist, hands, and fingers all to be in the normal range; her dexterity and grip strength in the normal range; no deformities or atrophy of the muscles; but there was a positive finding of multiple tender points. (R. 270-73).  Dr. Reddy's examination also noted that Plaintiff's musculoskeletal system revealed no deformities or atrophy of the muscles. (R. 19, 273).  Dr. Reddy diagnosed Plaintiff with a history of fibromyalgia, hypertension, and insomnia. (R. 19, 269-73).

In September 2011, Plaintiff was examined by a psychologist, Dr. Mary Arnold.  (R. 275-77).  Plaintiff stated in her meeting with Dr. Arnold that she tries to walk her 100 pound Bull

Mastiff dog, load dishes in the dishwasher, and tries to clean the bathroom. (R. 276).  Plaintiff informed Dr. Arnold that she was laid off in 2009 and was drawing an extension of unemployment benefits and has maintained insurance. (R. 20, 275).  She also told Dr. Arnold that she had not received any prior mental health services. (R. 20, 277).  Dr. Arnold observed that Plaintiff's gait and posture were without over indicators, pain, or impairment. (R. 20, 276).  Dr. Arnold found Plaintiff to have appropriate behavior, that her cognition was in the usual range, and her speech was fluid. (R. 275-77).  Dr. Arnold also found Plaintiff's intellectual functioning to be in the low average range, but she was able to manage her funds. (*Id*.).  Dr. Arnold noted that Plaintiff was amused by some of the examination items. (R. 23, 276).

On October 21, 2011, Dr. Estock completed a psychiatric review technique. (R. 278-91).  Dr. Estock noted that Plaintiff had moderate degrees of limitation in her daily living, social functioning, concentration, persistence, and pace. (R. 288).  Additionally, Dr. Estock completed a Mental Residual Functional Capacity Assessment. (R. 300-03).  He found that Plaintiff had moderate limitations in the following areas:  her ability to understand and remember detailed instructions and carry them out; maintain attention and concentration; work in coordination or proximity to others without being distracted; sustain concentration and persistence; act appropriately with the general public; accept instructions and respond appropriately to criticism; adapt to changes in the work setting; and to set realistic goals or make plans independently of others. (*Id*.).  He also found Plaintiff had moderate restrictions in her activities of daily living, social functioning, and maintaining concentration, persistence, or pace. (R. 20, 288).  Next, Dr. Estock concluded that Plaintiff could understand and recall simple material. (R. 20, 300).  Additionally, Dr. Estock determined the following:  Plaintiff could execute simple one to two-step commands, but would show moderate impairment if asked to follow detailed or complex

serial instructions; she would show irritable distractibility if required to work in very close proximity to numerous others, but that effect would fade with exposure; she could be expected to miss a day of route duties every thirty days or so due to psychiatric impairment; her contacts with the general public in work situations should be brief, superficial, and infrequent; she could be expected to respond adequately to dire, non-confrontational supervision; and she would adapt to simple, gradual, and well-explained workplace changes. (*Id.*).  Finally Dr. Estock opined that Plaintiff could make adequate decisions and plans reliably. (*Id.*).

On the same date as Dr. Estock's reports, Dr. Heilpern completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. 292-99).  Dr. Heilpern found that Plaintiff could frequently lift 25 pounds, and occasionally lift 50 pounds; stand and walk or sit with normal breaks for about 6 hours in an 8-hour workday; unlimited in push and/or pull operations; and had occasional postural limitations in climbing, balancing, stooping, kneeling, and crawling.  (R. 293-94).  Dr. Heilpern additionally found that Plaintiff could frequently stoop and crouch, and occasionally balance, kneel, crawl and climb ramps, stairs, ladders, ropes, or scaffolds. (R. 294).  Further, Dr. Heilpern determined that Plaintiff has no manipulative, visual, or communicative limitations, but should avoid concentrated exposure to extreme cold. (R. 295-96).

During the hearing, on direct examination from Plaintiff's representative, Plaintiff testified that she was diagnosed with Raynaud's Syndrome around October 2012 but has had fibromyalgia for twenty-five years. (R. 40, 42).  She indicated she is in constant pain from her fibromyalgia – at a level of seven to eight on a ten point scale. (R. 50).  Plaintiff also testified that she has a hard time "gripping or picking something up" due to Raynaud's syndrome. (R. 40).  Additionally, she has trouble walking due to numbness in her feet and that she uses an electric blanket to stimulate circulation. (R. 41).  Further, she sleeps about four hours a night, cannot lift

a frying pan, can only walk approximately a fourth of a block before she has to sit down because of pain, does not shop because of pain, can only stand for approximately 15 to 20 minutes before having to sit and can only do so for a short period of time before her hips start to hurt her and the pain spreads to her legs. (R. 43-47).  Plaintiff also stated that she drives once a week and that her "husband does all my groceries," she does not do any of the household chores, and that she uses a tanning bed to "help the pain." (R. 47-50).  When asked how many days during the month she would consider bad days due of pain, Plaintiff testified that three-quarters of the month she hurts badly and because of pain, she would be unable to do any kind of job. (R. 51).

Next, the ALJ questioned Plaintiff.  The ALJ asked questions regarding her operation of a daycare. (R. 52).  Plaintiff responded that she ran the daycare roughly 30 years ago in order to raise her children before they went to school. (R. 52-53).  Plaintiff then testified that her arm would hurt when she held her children and that led to her being "diagnosed."[1] (R. 52).

Toward the end of the hearing, the ALJ posed hypothetical questions to the Vocational Expert, who had reviewed the relevant evidence concerning Plaintiff's past work. (R. 53-61).  In response to the first hypothetical question, taking into account an individual's age, education, capabilities, and limitations as described by the ALJ, the Vocational Expert stated that a floral designer job at Wal-Mart or a grocery store could still be performed because there would be no concentrated exposure to the cold. (R. 56).  Additionally, the Vocational Expert testified that under the first hypothetical the following would not be excluded: sewing machine operator, cashier II, laborer, hand packager, and night cleaner. (R. 56-57).

The ALJ posed a second hypothetical to the Vocational Expert.  Building off the first, he reduced the assessment from medium to light work.  The Vocational Expert responded that the

---

[1] The transcript does not specify what Plaintiff was diagnosed with but other testimony and documentation suggest she was diagnosed with fibromyalgia around this time.

floral designer job at Wal-Mart would be questionable because, although it is classified as light work, it has occasional components of medium work. (*Id*.). The Vocational Expert then stated that cashier II, information clerk, and marker would still fit within the second hypothetical. (R. 58-59).

The ALJ asked if all the jobs in the second hypothetical would require the frequent use of the hand and fingers to which the Vocational Expert answered that they did. (R. 59). The ALJ followed that question by asking the Vocational Expert what effect it would have if Plaintiff were limited to occasional use of the hand and fingers. (*Id*.). The Vocational Expert responded that there would be no jobs available for such a person. (*Id*.).

In the third hypothetical, the ALJ added another condition to the assumptions in the first two hypotheticals – pain severe enough to preclude the ability to pay attention, persistence, and concentration for two hours without a work break. (R. 59). The Vocational Expert again responded that under those assumed facts there would be no jobs available. The ALJ then asked the Vocational Expert what affect there would be if the work breaks needed were more frequent than generally scheduled for unskilled work. (*Id*.). But, in response to that question the Vocational Expert stated that such frequent breaks would not be tolerated in the workplace. (*Id*.). The ALJ continued by adding two or more days of absenteeism per month and then asked what effect that would have. (*Id*.). The Vocational Expert responded that based on those facts all jobs would be eliminated. (*Id*.). The final question the ALJ posed to the Vocational Expert was what effect it would have if the individual was unable to tolerate a standard workday on a regular basis and a standard work week, to which the Vocational Expert responded that the individual would be unable to maintain employment. (R. 60).

II.     **ALJ Decision**

Disability under the Act is determined under a five-step test.   20 C.F.R. § 404.1520.

First, the ALJ must determine whether the claimant is engaging in substantial gainful activity.

20 C.F.R. § 404.1520(a)(4)(i).   "Substantial work activity" is work activity that involves doing

significant physical or mental activities.   20 C.F.R. § 404.1572(a).   "Gainful work activity" is

work that is done for pay or profit.   20 C.F.R. § 404.1572(b).   If the ALJ finds that the claimant

engages in substantial gainful activity, then the claimant cannot claim disability.   20 C.F.R. §

404.1520(b).

Second, the ALJ must determine whether the claimant has a medically determinable

impairment or a combination of medical impairments that significantly limits the claimant's

ability to perform basic work activities.     20 C.F.R. § 404.1520(a)(4)(ii).     Absent such

impairment, the claimant may not claim disability.   (*Id.*).   Third, the ALJ must determine

whether the claimant's impairment meets or medically equals the criteria of an impairment listed

in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and

404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. §

404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under

the third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ

must first determine the claimant's residual functional capacity ("RFC"), which refers to the

claimant's ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  In the fourth step,

the ALJ determines whether the claimant has the RFC to perform past relevant work.  20 C.F.R.

§ 404.1520(a)(4)(iv).   If the claimant is determined to be capable of performing past relevant

work, then the claimant is deemed not disabled.  (*Id.*).

If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.  20 C.F.R. § 404.1520(a)(4)(v).  In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience.  20 C.F.R. § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Turning to the ALJ's application of this multi-step analysis, at the first step of the analysis, it was determined that Plaintiff has not engaged in substantial gainful activity since September 15, 2009.  (R. 14).  At the second step, the ALJ next determined that Plaintiff has the severe impairment of fibromyalgia and non-severe impairment of Reynaud's syndrome. (*Id*.).

At the third step of the analysis, the ALJ determined that Plaintiff's medically determinable mental impairments of depression and adjustment disorder considered singly and in combination do not cause more than a minimal limitation of Plaintiff's ability to perform basic mental work activities and are non-severe. (*Id*.).  In making this finding, the ALJ considered four broad functional areas known as "paragraph B" criteria, as well as section 12.00C of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15).  In support of this finding, the ALJ went into substantial detail regarding Plaintiff's activities of daily living.  To analyze the "paragraph B" criteria the ALJ examined both Plaintiff's Function Report and the Third Party Function Report completed by Plaintiff's husband.  In reviewing Plaintiff's Function Report, the ALJ found that Plaintiff has no problem independently handling her personal care needs, and does not need special reminders to groom or take her mediation. (R. 15, 164-65).  Additionally,

the ALJ found that Plaintiff has no problem getting along with family, friends, neighbors, and authority figures. (R. 15, 168).

The ALJ then turned to the Third Party Function Report completed by Plaintiff's husband and went through that report in detail. (R. 15, 181).  The ALJ noted that Plaintiff's husband stated that:  Plaintiff has no problem independently handling her personal care needs and does not need any special reminders to groom or take her medication (R. 15, 182-83); she occasionally prepares meals, cooks one or two times each month, does some housework, and does not need encouragement to complete these tasks (R. 15, 183); she goes out alone, shops for groceries, pays bills, counts change, handles a savings account, and uses a checkbook (R. 15, 184); and she has an average attention span, is able to complete tasks, follow written and verbal instructions, but is unable to handle stress or changes in routine (R. 15, 186).  The ALJ further noted that Plaintiff paints flowers as a hobby roughly every two weeks. (R. 15, 167).

The ALJ then examined the fourth functional area, which considers any episodes of decompensation.  The "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps two and three of the sequential evaluation process.[2]  (R. 16).  The ALJ found that Plaintiff has experienced no episodes of decompensation over an extended duration. (R. 15).  The ALJ concluded that Plaintiff's medically determinable mental impairments cause no more than "mild" limitations in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, and thus non-severe according to 20 C.F.R. § 416.920(a)(d)(1). (*Id*.).

With regard to Plaintiff's mental impairments, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one

---

[2] Steps four and five of the sequential evaluation process require a more detailed assessment by itemizing various functions contained in the broad categories found in "paragraph B" of the adult mental disorders listing in 12.00 of the Listing of Impairments (SSR 96-8p).

of the listed impairments in 20 C.F.R. § 404, Appendix 1, Subpart P (20 C.F.R. §§ 404.1520(d), 404.125, and 404.1526). (R. 16).  The ALJ noted that 20 C.F.R. § 404, Appendix 1, Subpart P, outlines the findings which must be present under each of the body systems for an impairment to be found disabling. (*Id*.).  The ALJ found that no examining or treating physician or medical expert has concluded that Plaintiff's impairment meets or equals a listed impairment. (*Id*.).  The ALJ stated that he compared Plaintiff's impairment to all listed impairments. (*Id*.).  Further, the ALJ stated that the criteria could be applied only if the impairment persists despite the fact that the individual is following the prescribed treatment. (*Id*.).  Considering all these factors, the ALJ found that the severity of Plaintiff's impairments do not meet the requirements of any of the impairments listed by the Commissioner in Appendix 1. (R. 16).

Next, the ALJ determined Plaintiff had the RFC to perform medium work, as defined in 20 C.F.R. §§ 404.1567(b), with the following exceptions:  she could frequently lift and carry twenty-five pounds and occasionally fifty pounds; stand, walk, and sit for approximately six hours during an eight-hour workday; occasionally climb ramps, stairs, ladders, ropes, or scaffolds; has no manipulative, visual, or communicative limitations; and should avoid concentrated exposure to extreme cold. (*Id*.).  In making this determination, the ALJ stated that he had considered all of Plaintiff's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medial evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR's 96-4p and 96-7p. (R. 16).  Further, the ALJ stated that he considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p. (*Id*.).  In considering Plaintiff's symptoms, the ALJ followed a two-step process.  The first step asks whether there is an underlying medically determinable physical or mental impairment that can be shown by

13

medically acceptable clinical and laboratory diagnostic techniques and that could reasonably be expect to produce Plaintiff's pain or other symptoms. (*Id*.). Second, if it is shown that there is an underlying physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or other symptoms, an ALJ evaluates the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which Plaintiff's functioning is limited. (R. 16-17). For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, an ALJ must make a finding on the creditability of the statements based on a consideration of the entire case record. (R. 17). Here, the ALJ then went through the same review of Plaintiff's Function Report and Third Party Function Report that are discussed under the third step above. (*Id*.).

After establishing Plaintiff's RFC, the ALJ determined Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms; however, he also concluded her statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the RFC assessment. (R. 20-21). The ALJ found that Plaintiff's allegations and contentions regarding the nature and severity of the impairment-related symptoms and functional limitations were only partially credible. (R. 21). The ALJ noted that while the allegations regarding the nature of these symptoms are found to be supported within the medical evidence in the file, the contentions regarding the severity of, and the related functional restrictions, are not fully supported. (*Id*.). The ALJ found insufficient evidence that Plaintiff's condition is severe enough to prevent her from working. (*Id*.). In coming to this conclusion the ALJ once again looked to Plaintiff's medical records. The ALJ noted that Plaintiff primarily sought treatment from Dr. Hood for cold symptoms and the

symptoms improved with medication. (R. 21-22, 264).  The ALJ then looked to Plaintiff's mental conditions and found that even though Dr. Arnold had diagnosed Plaintiff with adjustment disorder, there was insufficient evidence to support a finding that these conditions severely limited Plaintiff's ability to work. (R. 23, 277). Thus. the ALJ found that Dr. Arnold's diagnosis indicated moderate symptoms or moderate difficulties. (R. 23, 277).

The ALJ evaluated the various forms of testimony and evidence and articulated the weight he afforded to each.  First, the ALJ found that Plaintiff informed Dr. Arnold that she was laid off in 2009 and drew and extension of unemployment benefits. (R. 23, 275).  The ALJ noted that to receive unemployment benefits, Plaintiff had to apply for said benefits on a weekly basis. (R. 23).  Following this line of analysis, the ALJ noted that Alabama laws requires that "[p]art of the [unemployment compensation] application involves [a] Claimant certifying under penalty of law that she is 'seeking, available for, and willing to accept work during the full time hours and full work week.'" (R. 23).  ALA. ADMIN. CODE § 480-4-3.15.  The ALJ then found that the Alabama Administrative Code defines "available to work" to mean that a claimant "is in the vicinity, *physically able*, and free to accept work." (*Id*.) (emphasis added).  (R. 23).  The ALJ noted this contradiction and found that Plaintiff had clearly and unambiguously stated to the State of Alabama that she was physically capable of working; but in applying for disability benefits and supplemental social security income, she has asserted to the Administration that she is physically unable to perform any work. (*Id*.).   Thus, Plaintiff, under penalty of law, gave direct, contradictory statements to the State of Alabama on the one hand, and the Administration on the other. (*Id*.).  The ALJ concluded that such a direct contradiction in the face of criminal prosecution significantly diminishes Plaintiff's credibility and places into doubt the veracity of her statements. (*Id*.).

Next, the ALJ considered the opinion of Dr. Hood.  The ALJ recognized that Dr. Hood is a treating physician with an extensive treatment history of Plaintiff; therefore, deference should ordinarily be given to his conclusions.  (R. 23).  However, such deference is not required if Dr. Hood's opinion is inconsistent with other evidence in the record.  (*Id*.).  The ALJ noted that Dr. Hood stated that Plaintiff was unable to work due to fibromyalgia and depression. (R. 23, 306). However, the ALJ found that Dr. Hood's records indicate that he (1) primarily treated Plaintiff for cold symptoms and, (2) in any event, her pain symptoms improved with medication. (R. 23-24, 248-68, 304-18, 340-54).  The ALJ also noted that Dr. Hood stated that he was treating Plaintiff for depression and this was part of the cause that prevented her from working. (R. 24, 306).  However, the ALJ found that Plaintiff had received no mental health treatment, and also noted that Dr. Arnold assessed Plaintiff's GAF at 56, which indicated moderate symptoms or moderate difficulties. (R. 24, 274-77).  Based on this reasoning, the ALJ assigned little weight to Dr. Hood's opinion. (R. 24).

Further, the ALJ considered the opinion of Dr. Estock.  The ALJ found that there was no foundation or basis for Dr. Estock's mental health opinions as Plaintiff had not received any mental health treatment, nor even outpatient counseling. (R. 24).  The ALJ then compared Dr. Estock's findings with those of Dr. Arnold, who had examined Plaintiff, and assigned little weight to Dr. Estock's opinion. (*Id*.).

In addition to the medical opinions, the ALJ also considered the reports of Plaintiff's husband set forth in his Third Party Function Report as a non-medical opinion in accordance with 20 C.F.R. § 416.913(d) and SSR 06-03p.  The ALJ noted Plaintiff's husband has frequent and extensive interaction with Plaintiff, and his observations are consistent with the evidence of record and her RFC. (R. 24).  The ALJ noted that the Third Party Function Report Plaintiff's

husband filled out, stated that Plaintiff has no problem handling her personal needs, does not need special reminders to groom or take medication, does housework, occasionally prepares meals, is able to go out alone, ride in and drive a car, shop for groceries, and pay bills. (R. 24, 181-88).  For these reasons, the ALJ gave some weight to the views of Plaintiff's husband. (R. 24).

In summary, the ALJ found that Plaintiff's RFC is fully supported by the objective evidence, treatment records, her activities, the opinion of the State Agency medical consultant, and the record as a whole. (R. 25).

At the fourth step, the ALJ found that Plaintiff is capable of performing past relevant work as a floral designer, and determined that work does not require the performance of work related activities precluded by Plaintiff's RFC.  (R. 25).  *See* 20 C.F.R. § 404.1565.  The ALJ instructed the Vocational Expert to assume a hypothetical individual of Plaintiff's age, education, work experience, and RFC. (*Id.*).  The ALJ then asked the Vocational Expert whether such and individual would be capable of performing Plaintiff's past work.  (*Id.*).  The Vocational Expert answered that such a hypothetical individual would still be capable of performing Plaintiff's past relevant work as a Floral Designer.  (*Id.*).  Further, the ALJ determined that in addition to being capable of performing past relevant work, there are other, alternative jobs existing in the national economy that Plaintiff is capable of performing.  (*Id.*).

The ALJ then made alternative findings at step five of the sequential evaluation process. (*Id.*).  The ALJ found Plaintiff was born on March 12, 1957 and was 52 years old, which is defined as an individual closely approaching advanced age, on her alleged disability onset date (20 C.F.R. § 404.1563) (*Id.*).  Plaintiff had acquired at least a high school education and is able to communicate in English. (20 C.F.R. § 404.1564) (*Id.*).  Transferability of job skills is not

material to the determination of disability because utilization of the Medical-Vocational Rules as a framework supports a finding that Plaintiff is not disabled, whether or not Plaintiff has transferable job skills. (R. 25-26). *See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2.

The ALJ found, in the alternative, that considering Plaintiff's age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Plaintiff can perform (20 C.F.R. §§ 404.1569, 1569(a)). (R. 26).  In making this determination (*i.e.*, whether Plaintiff can make a successful adjustment to other work), the ALJ considered Plaintiff's RFC, age, education, and work experience in conjunction with the Medical-Vocational Guidelines 20 C.F.R. Part 404, Subpart P, Appendix 2.  The ALJ noted that the Vocational Expert testified during the hearing that given all the factors, an individual would be capable of performing the requirements of representative occupations such as laborer in stores, hand packager, night cleaner, and marker. (*Id*.).  The ALJ concluded that based on the testimony of the Vocational Expert and considering Plaintiff's age, education, work experience, and RFC, Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy and a finding of "not disabled" is therefore appropriate. (*Id*.).

### III.    Plaintiff's Arguments for Reversal

Plaintiff presents two arguments for reversal. First, she argues that the ALJ failed to properly evaluate the medical source opinion of Dr. Hood, her treating physician. (Pl's Mem. 7). Second, Plaintiff contends that the ALJ failed to pose a question to the Vocational Expert which included her prescribed need for a walker. (Pl's Mem. 9).

## IV.     Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See Id*. (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1529.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

## V.     Discussion

After careful review, the court concludes that the ALJ's findings are supported by substantial evidence and that the ALJ correctly applied the law.  The court addresses Plaintiff's arguments below.

1.     **The ALJ Did Not Err in Affording Less Weight to Plaintiff's Treating Physician and the ALJ's Findings are Supported by Substantial Evidence.**

Plaintiff argues that the ALJ failed to properly evaluate the medical source opinion from her treating physician, Dr. Hood. (Pl's Mem. 7).  The court disagrees.

The Eleventh Circuit has made clear that the opinion of a treating physician is to be given substantial weight unless "good cause" is shown to treat it differently.  *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).  It is reversible error if the ALJ fails to clearly articulate good cause for discounting the opinion of the treating physician.  *Id*.  Good cause is shown when the opinion of the treating physician is not supported by objective medical evidence or is inconsistent with the record as a whole, or inconsistent with the physician's own treatment records.  *See* 20 C.F.R. §§ 404.1527(c) and 416.927(c)(2); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60 (11th Cir. 2004); *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  Opinions of non-treating physicians may be given greater weight than those of treating physicians, as long as there is substantial evidence in the record to support so crediting the non-treating physician's opinion. *See* 20 C.F.R. §§ 404.1512(b)(6), 404.1527(e)(2)(i) and (iii), 416.912(b)(6), 416.927(e)(2)(i) and (iii); SSR 96-6p WL 374180; *Crawford*, 363 F.3d at 1159-60 (11th Cir. 2004); *Jarrett v. Comm'r of Soc. Sec.*, 422 Fed. App'x. 869, 872-74 (11th Cir. 2011).

In this case, the court finds the ALJ applied the correct legal standards.  First, the ALJ clearly articulated that he was giving Dr. Hood's opinion little weight because Dr. Hood's opinions were inconsistent with the record as a whole.  On August 23, 2012, Dr. Hood opined that Plaintiff was unable to work due to her fibromyalgia. (R. 23, 306).  However, from September 13, 2010 through July 21, 2011, the ALJ found that Plaintiff primarily sought treatment for cold symptoms and all of her physical examinations were normal. (R. 23).  The

ALJ specifically noted that Plaintiff saw Dr. Hood on October 4, 2010, October 25, 2010, November 8, 2010, and March 28, 2011 for cold symptoms and denied muscle weakness, joint pain, or fatigue during each visit (except on November 8, 2010).  (R. 23, 251, 253, 255, 262). Plaintiff visited Dr. Hood on September 13, 2010 for a follow up for fibromyalgia pain and Dr. Hood noted that her pain improved with medication. (R. 249).  Plaintiff visited Dr. Hood on December 21, 2010 regarding symptoms of hypertension, but denied muscle weakness, joint pain, or back pain.  (R. 257).  On March 14, 2011, Plaintiff visited Dr. Hood for back pain, but it was noted then that her pain "improves with medication." (R. 259).  Then, on April 12, 2011, Plaintiff visited Dr. Hood with a chief complaint of fibromyalgia. (R. 264).   In this visit Plaintiff's pain was noted to be a "9" without medication and a "3" with medication. (*Id*.). Further, Dr. Hood noted in his musculoskeletal evaluation "[n]o clubbing, cyanosis, or edema grossly normal motor and strength." (R. 265).  Dr. Hood additionally saw Plaintiff on October 17, 2011 for a yeast infection where Plaintiff requested a steroid shot for fibromyalgia. (R. 318).

Plaintiff next visited Dr. Hood on January 3, 2012 for cold symptoms and a follow up on fibromyalgia.  (R. 317).  The handwritten notes from this visit indicate that with medication Plaintiff's pain level was at a two to three. (*Id*.).  Dr. Hood saw Plaintiff again on four additional occasions ─ February 2, 2012, February 22, 2012, April 18, 2012, and May 3, 2012.  On these visits, Plaintiff complained primarily of cold symptoms, including cough and congestion. (R. 309-14).  Following those visits, Plaintiff saw Dr. Hood on June 7, 2012 to discuss pain in her right shoulder from "lifting and pulling boxes," changing her blood pressure medicine, dry mouth caused by medication, and a renewal for her disability. (R. 307-08).  It was during this visit that Dr. Hood issued his opinion that Plaintiff was unable to work. (R. 306).

21

Additionally, Dr. Hood noted that he was treating Plaintiff for depression. (R. 306). However, as the ALJ found, Plaintiff had received no mental health treatment, and this is evidenced not only by the medical record evidence but also by Plaintiff's own testimony. (R. 24, 277). Further, the ALJ compared Dr. Hood's statement regarding depression to the report of Dr. Arnold, who assessed Plaintiff's GAF at 56 (indicating moderate symptoms or moderate difficulties). (*Id*.).

Plaintiff told Dr. Arnold that she was laid off in 2009 and was still drawing an extension of unemployment benefits. (R. 275). The ALJ noted that in order to receive unemployment compensation, Plaintiff was required to apply for benefits on a weekly basis. (R. 23).  Following this line of reasoning, the ALJ observed that Alabama law requires, as part of the unemployment application process that a claimant certify under penalty of law that she is "seeking, available for, and willing to accept work during the full time hours and full work week." (*Id*.).  ALA. ADMIN. CODE § 480-4-3.15.  The ALJ noted that the Alabama Administrative Code defines "available to work" as work that is in the claimant's vicinity, and that the claimant is "*physically able*, and free to accept work."  (*Id*.) (emphasis in original).  Thus, Plaintiff's own certifications to the State of Alabama, made under penalty of perjury, contradict her testimony and statements, and the opinion of Dr. Hood.  For all these reasons, this court finds there is substantial evidence to support the ALJ's decision to give little weight to Dr. Hood's opinion.

### 2.   The ALJ Did Not Commit Error by Failing to Pose a Question to the Vocational Expert Which Included Plaintiff's Prescribed Need for a Walker.

Plaintiff next argues that the ALJ failed to pose a question to the Vocational Expert which included her use of a walker and that failing to do so was error. (Pl's Mem. 9).  The court finds this argument is without merit.

Plaintiff asserts that the ALJ did not "even mention [her] need for a prescribed walker in his decision." (Pl's Mem. 11).  To the contrary, the ALJ directly addressed Plaintiff's use of a walker when he noted that she had testified that she "has trouble walking, and uses a prescribed walker." (R. 21).  But, the ALJ also noted that Plaintiff, in receiving an extension of unemployment benefits, held herself as being physically able to accept work, the need for a walker notwithstanding. (R. 23).

In reviewing the record, this court finds that the ALJ posed several postural limitations in the hypothetical questions posed to the Vocational Expert which are consistent with Plaintiff's use of a walker, such as occasional "climb[ing] ramps and stairs, ladders, ropes, and scaffolding, kneeling, and crawling." (R. 55).

Further, Plaintiff argues that the ALJ's finding that she "could perform medium work, lifting upwards of 50 pounds, while using a walker presents an absurd picture." (Pl's Mem. 11). But as picturesque as this argument is, its force is negated by substantial evidence in the record. Dr. Hood prescribed the walker to Plaintiff on January 3, 2012. (R. 312).  However, six months later on June 7, 2012, Dr. Hood saw Plaintiff for a right shoulder injury she suffered when she was "*lifting and pulling* boxes." (R. 308) (emphasis added).  The ALJ's RFC findings are consistent with the record in this regard.  The Vocational Expert testified that Plaintiff's past relevant work as a floral designer was performed at a light level. (R. 53).  Further, Plaintiff stated in her disability report that she *did not lift or carry any weight*, nor did she engage in any of the postural functions mentioned in the ALJ's hypothetical. (R. 148) (emphasis added).  Neither Eleventh Circuit case law nor the Social Security Regulations require an ALJ to provide a detailed written analysis of each impairment and its effect on a claimant's ability to perform each and every work-related function such as sitting, standing, walking, lifting, carrying, pushing, and

pulling. *See Carson v. Comm'r of Soc. Sec.*, 440 Fed. Appx. 863 (11th Cir. 2011) (holding that, although the ALJ "did not specifically refer to [the claimant's] ability to walk or stand," the ALJ's opinion was nevertheless sufficient to allow the court to determine that the ALJ "did fully consider [the claimant's] limitations with regard to walking and standing."). Here, in making his RFC determination, the ALJ went into great detail regarding all of Plaintiff's symptoms, and the extent to which the symptoms could be reasonably accepted as consistent with the objective medical evidence and other evidence (based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p). Substantial evidence supports the ALJ's findings.

This court finds, therefore, the ALJ did not err when he did not pose a question to the Vocational Expert which included Plaintiff's prescribed need for a walker. Further, this court concludes that the ALJ's RFC determination is supported by evidence in the record.

## VI.    Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this August 28, 2015.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE